**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**CASE NO. 3:16-cv-00778-MMH-PDB**

STACEY DOOLIN, as Personal Representative of
the Estate of RICHARD E. DOOLIN,

Plaintiff,

vs.

AMERICAN OPTICAL CORPORATION, et al.,

Defendants. /

**DEFENDANT BORGWARNER MORSE TEC LLC'S MOTION TO EXCLUDE OPINIONS OF DR. STEVEN COMPTON, UNDER *DAUBERT;* ALTERNATIVE REQUEST FOR *DAUBERT* HEARING; AND SUPPORTING MEMORANDUM OF LAW**

Defendant BorgWarner Morse TEC LLC ("Morse TEC"), by and through its undersigned counsel and pursuant to Federal Rule of Evidence 702, hereby moves to exclude the testimony of Dr. Steven Compton, an expert witness retained by Plaintiff. The grounds for this motion are contained in the following memorandum of law.

## I. INTRODUCTION

Richard Doolin ("Decedent") died of pericardial mesothelioma in 2014. His estate has brought this action against several companies that manufactured products which allegedly contained asbestos components to which Decedent claims exposure. There has been no specific testimony in this case that Decedent worked with or around any product manufactured or sold by Morse TEC, asbestos-containing or otherwise. Dr. Steven Compton is a physicist retained by Plaintiff to render risk of exposure opinions. It is anticipated that he will provide testimony regarding an unpublished study regarding one allegedly asbestos-containing product manufactured

by Morse TEC. Dr. Compton produced a report, attached as **Exhibit A** and gave a deposition on October 13, 2017, attached as **Exhibit B**.

The opinions of Plaintiff's expert, Dr. Compton, fail to meet the standards of scientific reliability and validity mandated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993). Dr. Compton draw speculative hypotheses about Decedent's alleged exposure to asbestos from insufficient facts and data which are neither based upon reasonable scientific assumptions nor the product of reliable scientific principles and methods. The methodology that Dr. Compton employs in reaching his conclusions, or perhaps, more particularly, the lack of methodology that he employs, demonstrates that the results are not and cannot be reliable or scientific. Further, Dr. Compton fails to employ the same level of scientific rigor that characterizes the practice of other experts in his field outside of the courtroom.

Dr. Compton opines that Decedent "was exposed to significant levels of asbestos fibers in his breathing zone while working with and around others working with asbestos-containing friction parts, including those parts manufactured … [by Morse TEC] …"[1] His "scientific method" in coming to this conclusion is based on a study performed by Dr. Compton's company, MVA Scientific Consultants ("MVA"), involving mostly brake friction material and some clutch friction material, and "research reports."[2] Dr. Compton has no knowledge about any Morse TEC products that Decedent may or may not have actually come into contact with, nor any dose estimate for Decedent's alleged asbestos exposure.[3] Dr. Compton is not aware of any studies regarding fiber release during handling, removal, and replacement of clutch-facing materials.[4]

---

[1] Compton Report (**Exh. A**) 2.

[2] Compton Report (**Exh. A**) 2, Appendix D.

[3] Compton Dep. (**Exh. B**) 14:23-25, 46:11-19, October 13, 2017.

[4] Compton Dep. (**Exh. B**) 47:6-22, 10/13/17.

Dr. Compton's expert opinions as to Morse TEC do not satisfy the foundational requirements of Federal Rule of Evidence 702, because they are not based on sufficient facts and data and are not the product of reliable methodology, including reasonable assumptions and generally reliable scientific methods. Because Plaintiff cannot establish that Dr. Compton's opinions are the result of the requisite scientific reliability that *Daubert* and its progeny demands, his opinions should be excluded. Alternatively, Morse TEC requests a *Daubert* hearing under Federal Rules of Evidence 402 and 403.

## II. DR. COMPTON'S OPINIONS AND THEIR BASES

Dr. Compton provides the following relevant opinions: Decedent "was exposed to significant levels of asbestos fibers in his breathing zone while working with and around others working with asbestos-containing friction parts, including those parts manufactured … [by Morse TEC] …;" "asbestos fibers are released into the breathing zone of the worker while sanding, filing, and grinding new brake linings as well as relining and replacing worn brakes;" and "[f]riction materials such as brake and clutch linings often contained chrysotile asbestos as a component in the past." [5] The bases of these opinions are his "education, training, and experience as well as the research reports by MVA ... and other documents." [6]

Dr. Compton repeatedly refers to the MVA studies that are the bases of his opinions throughout his deposition. The MVA reports and studies have not been published and there is no evidence of peer review.[7] Additionally, the fiber release studies conducted by MVA, and relied

---

[5] Compton Report (**Exh. A**), p. 1-2.
[6] Compton Report (**Exh. A**), p. 2.
[7] Compton Dep. (**Exh. B**) 51:3-22, 10/13/17.

upon by Dr. Compton, are pertaining to brake friction parts, not clutch friction parts, let alone any parts manufactured by Morse TEC.

## III. DR. COMPTON IS NOT QUALIFIED TO OFFER OPINIONS IN THIS CASE

As a preliminary matter, Plaintiff must first establish that Dr. Compton is qualified to offer opinions. Expert testimony is admissible only if the witness has expertise in the specific and discrete area with respect to which he or she intends to testify. *See Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) *aff'd*, 609 F.3d 1183, 1193 (11th Cir. 2010).

"To meet the qualification requirement, a party must show that its expert has sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is before the court." *Id*. 1193; *see also* Fed. R. Evid. 702. Stated otherwise, it is not enough that a proposed expert be qualified generally. Rather, they must possess the specific expertise necessary to opine on the subject of the proposed opinion. *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277-MARTINEZ-GOODMAN, 2016 WL 7507848 (S.D. Fla. Aug. 1, 2016). Moreover, "even if the witness has special knowledge or general experience, the court must confirm that the witness' competence matches the subject matter of each opinion to be given. *Id.* at *3; *see also Wright v. Case Corp.*, No. Civ. A 1:03 CV 1618-JEC, 2006 WL 278384 at *3 (N.D. Ga. Feb. 1, 2006) (mechanical engineer was not qualified to testify that the product at issue was defective or to offer alternative designs because he "has very little experience with the type of machinery at issue" and had not "made a serious effort to gain expertise since [being] retained [ ] as an expert")).

Dr. Compton obtained a Ph.D. in physics in 2009. (Exh. A at 6). He admits that he lacks education in risk-assessment.[8] He is not an epidemiologist and has never participated in an epidemiologic study.[9] He has no training in toxicology.[10] He has no educational experience in auto mechanics.[11] ***Most importantly, Dr. Compton is not a certified industrial hygienist***.[12] He has never conducted an industrial hygiene survey concerning asbestos exposure in any automobile facility, nor has he performed any air sampling for asbestos exposure while automobile repair work was being performed at an automobile facility. Dr. Compton's tests are not designed to measure the potential exposure of individuals doing clutch repair.

Notwithstanding that, he does not have expertise in such areas as the calculation of time-weighted exposures for a particular plaintiff, he seeks to opine about the release of asbestos into the air and more particularly, that Decedent was exposed to significant levels of asbestos fibers. It is clear that Dr. Compton does not have the requisite expertise to opine in the areas about which he seeks to testify.

## IV. THE *DAUBERT* STANDARD

When a party raises a *Daubert* challenge to expert opinions, Fed. R. Evid. 10(4) requires the trial court to make an admissibility determination. *Daubert* requires that trial courts act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach the jury. *Daubert*, 509 U.S. at 597, n. 13. The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same

[8] Compton Dep. (**Exh. B**) 7:6-21, 10/13/17.
[9] Compton Dep. (**Exh. B**) 13:22-14:1, 10/13/17.
[10] Compton Dep. (**Exh. B**) 15:23-25, 10/13/17.
[11] Compton Dep. (**Exh. B**) 27:16-24, 10/13/17.
[12] Compton Dep. (**Exh. B**) 14:2-8, 10/13/17.

level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court, and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Expert testimony must meet three requirements to be admitted. First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by a *Daubert* inquiry. Third, the testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue. *See Tuscaloosa v. Harcros Chemicals*, *Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). The burden of establishing these requirements rests on the proponent. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

In short, expert testimony must be both relevant and reliable. Expert testimony is relevant if it can "logically advance a material aspect of a party's case," and is reliable if it has "a reliable basis in the knowledge and experience in the relevant discipline." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citations omitted). In analyzing reliability, courts are not concerned with an expert's conclusions but focus on the soundness of the expert's methodology. *Id.*

> Importantly, although there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate. Thus, for example, while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor

> of reliability. By the same token, a reliable opinion expressed by a genuinely qualified expert may not help the jury if it does not pertain to a fact at issue in the case.

*Quite Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

Although the focus of the overall inquiry must be on principles and methodology and not on conclusions, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Additionally, a scientific study must have a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92; *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004). Essentially, the trial court's duty is to prevent "junk science" from entering the courtroom. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

## V. DR. COMPTON DOES NOT COMPLY WITH PROPER METHODOLOGY PURSUANT TO *DAUBERT*.

The key to admissibility is methodology. *Daubert*, 509 U.S. at 589-90. Under *Daubert*, the district court must identify the basis of an expert's testimony and ascertain whether the methods, procedures, and information used by the expert to reach his or her conclusion are scientifically reliable. *See Joiner v. General Elec. Co.*, 78 F.3d 524, 530-30 (11th Cir. 1996), rev'd on other grounds in *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). "The *Daubert* requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain*, 401 F.3d at 1245. Additionally, Federal Rule of

Evidence 703 requires that the facts on which the expert relies must be reasonably relied upon by other experts in the field.[13]

### A. Dr. Compton's data is unreliable and there is too great an analytical gap between said data and his opinion.

While Dr. Compton has referenced allegedly scientific data to support his assertions that "asbestos fibers are released into the breathing zone of the worker while sanding, filing, and grinding new brake linings as well as relining and replacing worn brakes," said data must be scrutinized by the court and determined to be reliable in this scientific context before it will stand to support Dr. Compton's conclusions regarding the Decedent's circumstance.[14]

Expert's testimony must be reliable at each and every step or else it is inadmissible. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Id*. (quoting *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). "The court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d at 1265 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)). "[S]omething doesn't become scientific knowledge just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *Hughes*, 766 F.3d at 1331 (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)) (alteration in original).

13 District courts must "be mindful of other applicable rules", including Federal Rules of Evidence 703 and 403. *Daubert*, 509 U.S. at 595. Rule 403 allows a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

14 Compton Report (**Exh. A**), p. 1.

In applying these principles, courts have consistently held that experts must provide more than mere speculation and assumptions as the basis for their opinions. *See Tyger Constr. Co. Inc. v. Pensacola Constr. Co.,* 29 F.3d 137, 142 (4th Cir. 1994); *see also Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (a district court's gate-keeping function requires it to reject opinions that are predicated on "subjective beliefs or speculation"). Morse TEC asserts that Dr. Compton's casual reference to "scientific literature" is insufficient to meet this standard, and that Dr. Compton and MVA studies are not scientifically reliable.

Dr. Compton's MVA study is unreliable, un-published,[15] irrelevant, and not peer-reviewed. *See, e.g., Hendrix,* 255 F.R.D. at 588 (as a general rule, testing performed by a proffered expert must replicate with substantial similarity the conditions present at the time of the incident/accident at issue for the test methodology to be deemed reliable); *Ore v. Tricam Industries, Inc.,* No. 14-60269-CIV-SCOLA/OTAZO-REYES, 2015 WL 11197754 (S.D. Fla. Jul. 20, 2015) (circumstances of "screwdriver test" and "sledgehammer test" performed by defendant's expert were not substantially similar to those present at the time of plaintiff's accident and, therefore, expert testimony relating to those tests were unreliable and inadmissible under both Fed. R. Evid. 702 and *Daubert*); *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 904 (M.D. Fla. 1996) (expert testimony would be excluded where neither of plaintiffs' experts made any effort to ascertain or even approximate what level of exposure to irritants was created by plaintiffs' described use of latex paint that allegedly caused their asthmatic condition, nor did the expert quantify, in scientific terms, what level of exposure would have been sufficient to cause the plaintiffs' asthma). The MVA study did not measure fiber release into the air during the manipulation of clutch material.

---

[15] Compton Dep. (**Exh. B**) 51:3-22, 10/13/17.

Q. Would you agree with me, Dr. Compton, that that study did not measure fiber release during manipulation of clutch material?

A. That's correct.

Q. Would you agree with me that no air sampling was made during the manipulation of the clutch material in that study?

A. That's what I assumed your last question there was an investigation into release through contact with the clutch material.

Q. Let me reask the question. Did that study involve any measurement of release into the air of fibers as a result of manipulation in that clutch study?

MR. KUNIN: Objection. Form.

A. No. [16]

The MVA study tested a Borg & Beck-branded clutch of unknown age and origin, when a Borg Warner clutch is what was haphazardly identified by Decedent’s father.

Q. The clutch facing that was studied by MVA by Borg that we were talking about, the Borg material that was produced for the study, how old was that material? How long ago had it been manufactured?

A. I don't recall.

Q. Do you know how the material was stored between the time it was manufactured and the time that MVA got it to examine it?

MR. KUNIN: Objection. Form.

A. Not that I can recall.

BY MS. COLE:
Q. Do you know where that material came from? In other words, who had it during the time between its manufacturer and the time it was delivered to MVA?

A. Not that I can recall from memory.

Q. Do you know if that material had been manipulated by anyone else prior to MVA obtaining the material?

[16] Compton Dep. (**Exh. B**) 41:17-20, 42:3-8, 10/13/17.

A. If it had -- if it had, there were no markings or evidence of any such manipulation. [17]

Instead of testing in a way that could have been foreseeable that Decedent or any mechanic or bystander may actually have used a clutch facing, a piece of clutch material was removed from the clutch facing in a test chambers – not a simulated work environment, a finger was pushed down on the piece and placed on a sticky plate, and a microscopic analysis was completed of what was collected.

Q. Did that study involve a bulk analysis of the clutch material?

A. It did.

Q. In the bulk analysis, would you agree that what was done was to cut into a bit of the clutch facing and analyze what was physically taken out of that clutch facing by use of the electron microscope?

MR. KUNIN: Objection. Form.

A. That's part but not all of what we did.

BY MS. COLE:
Q. What was done in terms of the bulk analysis in the clutch facing?

A. The bulk analysis involved examination of the clutch materials by stereo microscopy or as light microscopy and transmissional electron microscopy supplemented by some scanning electron microscopy of particles that were transferred onto an analyst's skin.

Q. Was the transfer of the materials part of the bulk analysis or was that another phase of the test?

A. It's an analysis of bulk material that has been released through contact so it relates to both topics.

Q. Okay. In the study that was done where electron microscopy was used, was that only in the part involving the transfer of material to the analyst's skin?

[17] Compton Report (**Exh. A**), 49:20-50:19, p. 6 of Appendix D.

A. That's true for scanning electron microscopy. For transmission electron microscopy, what was done was an acid-based digestion to detect whether or not any amphibole minerals were present in the bulk sample.

Q. And the bulk sample was what was actually physically cut out of the clutch facing. True?

A. Either -- you're saying “cut out.” I don’t know that “cut out” would be the right way to put it. It would have been extracted using some kind of a rasp or some material to collect a representative subsample of that friction lining.

Q. In the test that was done on the sampling, how was the material transferred to the analyst’s skin?

A. It was by touching a finger to the surface of the friction lining.

Q. Sort of taking a swipe of the finger over the surface of the friction lining?

MR. KUNIN: Objection. Form.

A. Not a swipe, just pressing down and looking up.

BY MS. COLE:
Q. And then that material was then transferred to a plate where the analysis could be performed?

A. Correct. It’s an aluminum disc that has a conductive layer of carbon, an adhesion on top.

Q. So it’s sticky on the top. The finger was placed on top of the sticky plate and then the finger was removed?

MR. KUNIN: Objection. Form.

A. To collect any material that was on the finger, correct. [18]

This method of using a finger to test asbestos encapsulation is only used by MVA.[19] Dr. Compton could not even recall how Decedent was allegedly exposed to any clutch material,[20] -- nor was

[18] Compton Dep. (**Exh. B**) 42:13-44:20, 10/13/17.

[19] Compton Dep. (**Exh. B**) 52:16-53:12, 10/13/17.

[20] Compton Dep. (**Exh. B**) 45:24-46:19, 10/13/17.

Q. Can you point me to any place in any deposition where Richard Doolin is described as handling a clutch-facing?

MR. KUNIN: Objection. Form.

A. I recall that Mr. Doolin was asked if his son did any work with clutches, but I'd have to check the

Decedent actually exposed to any clutch material in the way described by Dr. Compton -- so it is unclear how this study is in any way relevant to this case.

Here, Dr. Compton does not possess the requisite knowledge, skill, or experience to offer an opinion on Morse TEC and its products. He cannot offer any scientific or relevant information regarding Morse TEC products or show that his "opinions have been subjected to peer review." *Frazier*, 387 F.3d at 1265. In fact, he cannot cite to a single published, peer reviewed study or article discussing Morse TEC products or supporting Plaintiff's contentions. In fact, he agrees that "there are no peer-reviewed published study [sic] that show the tremolite or actinolite fibers from friction product made it into the breathing zone of a motor vehicle mechanic."[21] This is the epitome of a situation where "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

### B. Dr. Compton's opinions disregard the significance of the dose-response relationship.

Another faulty premise of the opinion of Dr. Compton is that there is no safe level of exposure, and therefore every asbestos fiber located in a particular product is "significant."[22] In order for an expert opinion to be reliable, the opinion must be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Daubert*, 509 U.S. at 589. It is well-established that to recover in a toxic-tort case, a plaintiff must prove both the *minimum* dose necessary to cause the injury alleged, and the *actual* level of exposure to the toxic substance. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005)

testimony to see what the wording is. I don't recall if he was asked the specifics of how he handled those samples.

[21] Compton Dep. (**Exh. B**) 33:25-34:6, 10/13/17.

[22] Compton Dep. (**Exh. B**) 36:2-6, 75:2-76:2, 80:18-22, 10/13/17.

(citing *Mitchell v. Gencorp*, 165 F.3d 778, 781 (10th Cir. 1999)).[23] Therefore, when analyzing an expert's methodology in asbestos cases, "the court should pay careful attention to the expert's testimony about the dose-response relationship." *Id.* Indeed, "[t]he expert who avoids or neglects this principle . . . casts suspicion on the reliability of his methodology." *Id.*; *cf. Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013) (holding causation testimony admissible where expert "focused specifically on the amount of benzene to which Schultz had been exposed and related this amount to the scientific literature."). Dr. Compton neglects this exact principle[24] and Morse TEC asserts that Dr. Compton's opinions lack sufficient connectivity to the data cited to as support to be deemed scientifically reliable.

In this case, there has been no evidence of product identification as to Decedent specifically coming into contact with any Morse TEC asbestos-containing product, so there is no basis to opine that any work with or around any Morse TEC product could have resulted in asbestos exposure to Decedent. Roadway Edward Doolin ("Mr. Doolin"), Decedent's father, simply stated that clutch work was done in his workplace, that Decedent visited him on occasion in his work place from

---

[23] *See also Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996) (recognizing that to establish causation in a toxic-tort lawsuit, a plaintiff "must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover"); *see also Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the Plaintiff's burden.").

[24] Compton Dep. (**Exh. B**) 14:23-15:22, 47:6-22, 10/13/17.

Q. Do you have any opinions that you expect to testify to about the amount of fiber release, if any, that was experienced by Richard Doolin's handling of clutch-facing material?

MR. KUNIN: Objection. Form.

A. In terms of a specific number, no, not from handling alone.

BY MS. COLE:

Q Are you familiar with any studies that measured the use of compressed air on clutch-facing material to determine fiber release from those materials?

A There are a number of studies that have addressed the use of compressed-air and removal and replacement of friction materials, generally speaking. I don't recall if there's anything specific to clutches.

age 6 (1976) to age 12 (1983),[25] that Decedent "must have been around" when clutch work was being done, and that Mr. Doolin recalled the name Borg Warner as a clutch manufacturer.[26] Mr. Doolin also noted that Decedent did his own clutch work, but that was not until later in Decedent's life, with unknown brands of clutches, and Plaintiff is not alleging any asbestos exposure from that time period.[27]

Dr. Compton assumed that Decedent "frequently visited his father at work and at times assisted with automobile repair, like the removal and placement of brakes and clutches."[28] He also "understand[s] there would have likely also been some clean-up work involved." It is unclear where Dr. Compton obtained that information as no witness testified to observing any specific instance of Decedent changing a clutch and no witness testified as to Decedent doing any "clean-up work." It is also entirely unclear when any of these alleged brake and clutch jobs occurred, how may, if any, were clutch jobs, and whether they involved any asbestos-containing components. Trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable. *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F. 3d 77, 81 (1st Cir. 1998). Thus, it is evident that Dr. Compton's opinions regarding Decedent's circumstances are not sufficient connected to the alleged supporting data.

---

[25] Mr. Doolin stated initially stated from 1973 until 1983, Decedent's age 12 or 13; however, Mr. Doolin later testified that Decedent started accompanying him at age six and they moved from Pennsylvania in the summer of 1983, when Decedent would have been age 12. (Doolin Dep. 27:7-10, Jan. 19, 2017, attached as **Exhibit C**; Doolin Dep. 82:1-14, 67:23-68:4, March 16, 2017, attached as **Exhibit D**.)

[26] Doolin Dep. (**Exh. D**) 40:19-41:16, 43:10-19, 44:3-12, 44:24-45:7, 47:8-15, 51:20-52:6, 60:14-16, 66:12-23, 67:9-12, 3/16/17.

[27] Doolin Dep. (**Exh. C**) 31:9-32:9, 33:12-17, 1/19/17.

[28] Compton Report (**Exh. A**), p. 1.

### C. Dr. Compton fails to rely upon any epidemiological studies.

Courts have held that "epidemiological studies provide the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease." *Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001); *see also In re W.R. Grace & Co.*, 355 B.R. 462 (Bankr. D. Del. 2006); *In re Breast Implant Litigation*, 11 F. Supp. 2d 1217 (D. Colo. 1998) (collecting cases and observing that "[e]pidemiology is the best evidence of causation in the mass torts context"). Although he is not providing medical testimony, Dr. Compton is not relying upon epidemiological studies in this matter with respect to Morse TEC.[29] If permitted to testify at trial, he will rely on the suppositions that Decedent must have been around someone using a Morse TEC product, that he was near enough to be in the "breathing zone,"[30] and that said product contained and released asbestos. Dr. Compton makes a lot of assumptions and will not rely the actual science or the specific evidence in this case regarding Decedent's alleged exposures. These assumptions make his opinions inadmissible. *Tyger Constr. Co. Inc.*, 29 F.3d at 142; *Ammons*, 368 F.3d at 816.

## VI. CONCLUSION

Because Dr. Compton fails to offer opinions that are based upon sufficient facts and data, because his conclusions are not based upon scientific and reliable principles and methods, his opinions are not reliable. Further, because he did not adequately apply reliable principles and methods to the facts of this case, while his conclusions might be helpful to Plaintiff, they would not assist the trier of fact in properly determining any issues in this case. Dr. Compton does not

[29] Compton Dep. (**Exh. B**) 13:22-14:1, 31:13-18, 46:21-47:3, 10/13/17.
[30] Compton Report (**Exh. A**), p. 1.

utilize generally accepted methods or standards in reaching their opinions and do not employ the kind of methodology and rigor that other experts in his field would utilize outside the courtroom. Dr. Compton's "imprecise and unspecific" opinions mean that the jury could not readily determine whether his opinions are a "virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility." *Frazier*, 387 F.3d at 1265. Therefore, just as in *Frazier*, Dr. Compton's opinion will "easily could serve to confuse the jury, and might well [mislead] it," and should therefore be excluded. *Id*.

The Court should exercise its gatekeeping function and exclude the testimony and opinions of Dr. Compton in their entirety. In light of all of the above, the opinions of Dr. Compton should be excluded as unreliable, and not helpful to the jury, misleading, and unfairly prejudicial to Morse TEC. The methodology they employ is unscientific and unreliable and their opinions fail to satisfy the requirements of *Daubert*. For the foregoing reasons, Morse TEC respectfully requests that the Court exclude all of Dr. Compton's opinions as they relate to Morse TEC. Alternatively, Morse TEC requests a *Daubert* hearing under Federal Rules of Evidence 402 and 403 pursuant to Local Rule 3.01(j).

Respectfully Submitted,

BICE COLE LAW FIRM, P.L.

By: /s/ *Amanda Cachaldora*
Susan J. Cole, B.C.S., FBN: 270474
Melanie Chung-Tims, FBN: 27603
Amanda Cachaldora, FBN: 060907
999 Ponce de Leon Blvd., Ste. 710
Coral Gables, Florida 33134
(305) 444-1225 telephone
(305) 446-1598 facsimile
cole@bicecolelaw.com
chungtims@bicecolelaw.com
cachaldora@bicecolelaw.com
AsbestosService@bicecolelaw.com

*Counsel for BorgWarner Morse TEC LLC*

**CERTIFICATE OF SERVICE**

I hereby certified that on this 13th day of November, 2017, a true and correct copy of the foregoing has been electronically served via CM/ECF system which will send a notice of electronic filing to all Counsel of Record.

/s/ *Amanda Cachaldora*