# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO.: 3:16-CV-0778-MMH-PDB

STACEY DOOLIN, as Personal Representative of the Estate of RICHARD E. DOOLIN,

Plaintiff,

vs.

AMERICAN OPTICAL CORPORATION, etc., et al.,

Defendants.
_______________________________________/

Veritext Legal Solutions
One East Broward Boulevard, Suite 1101
Fort Lauderdale, Florida 33301
Friday, October 13, 2017
1:00 p.m. - 3:27 p.m.

TELEPHONIC DEPOSITION OF STEVEN P. COMPTON, PH.D.

Taken before MARIA E. REEDER, RPR, FPR and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

REPORTED BY:

MARIA E. REEDER, RPR, FPR
Veritext Florida Reporting
2 South Biscayne Boulevard, Suite 2250

APPEARANCES:
On behalf of the Plaintiff:
THE FERRARO LAW FIRM
600 BRICKELL AVENUE
Miami, FL 33131
BY: MARC P. KUNEN, ESQ. (Via Telephone)
mpk@ferrarolaw.com

On behalf of Honeywell:
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
BY: BRUCE BISHOP, ESQ. (Via Telephone)
bbishop@wilsav.com

On behalf of the Defendants:
COLE, SCOTT & KISSANE
9150 South Dadeland Boulevard, Suite 1400
Miami, Florida 33156
BY: ANDREW S. FREEDMAN, ESQ. (Via Telephone)
andrew.freedman@csklaw.com

On behalf of Borg Warner Morse TEC:
BICE COLE LAW FIRM
999 Ponce de Leon Blvd, Suite 710
Coral Gables FL 33134
BY: SUSAN COLE, ESQ. (Via Telephone)
Cole@bicecolelaw.com

On behalf of Ford Motor Company:
MCGUIRE & WOODS, LLP
101 West Main Street
Norfolk, Virginia 23510
BY: SHEP WAINGER, ESQ. (Via Telephone)
swainger@mcguirewoods.com



INDEX


Steven P. Compton, PH.D. Page
Direct by Mr. Bishop 04
Cross by Ms. Cole 37
Cross by Mr. Freedman 56
Cross by Mr. Wainger 67


EXHIBITS


For Identification Page
Exhibit 1 Testimony List 06
Exhibit 2 Notice of Deposition 06
Exhibit 3 Report 06
Exhibit 4 PowerPoint Presentation 11
Exhibit 5 Binders 82


(Exhibits never forwarded to the reporter.)



Thereupon:
STEVEN P. COMPTON, PH.D.,
A witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified on his oath as follows:
THE WITNESS: I do.
DIRECT EXAMINATION
BY MR. BISHOP:
Q Dr. Compton, my name is Bruce Bishop. I'll have some questions for you initially and then others on the phone will have additional questions.
Could you state your full name and your current business address.
A Steven Patrick Compton. That's 3300 Brenckinridge Boulevard, Suite 400, Dulutch, Georgia.
Q We're here on the Doolin matter. Can you identify what materials you received in connection with the Doolin matter?
A Absolutely. I received a copy of the complaint for the matter. And I received two deposition transcripts, for Mr. Edward Doolin and Roy Doolin.
Q Did you make any notes regarding your review of the two transcripts?
A No.



Q What materials, if any, do you have with you today?
A Aside from those three documents, I also have a copy of my report for this case. A copy of the deposition notice, and another number of items related to that deposition notice. Essentially my reliance materials, a CV, list of testimony.
Q The list of testimony that we have, which was appended to your report as Appendix C, was current as of, I think, March of 2017.
Do you have an updated copy?
A I do.
Q Could we arrange for you to provide a copy to the court reporter or to mark and he can forward it to the court reporter and then we'll mark that as Exhibit 1.
A That's fine.
MR. KUNIN: And this is Marc. After the deposition I can coordinate with the Doctor on getting all the material to the court reporter.
MR. BISHOP: Yeah, that's fine. Thanks very much.
And, for the record, we'll mark as Exhibit 2 the deposition notice. And as Exhibit 3 his report in the case, which frankly it's probably

easier to include the entire -- those materials, so it's his report and then the various appendices that were attached to his report. We'll just mark that collectively as Exhibit 3.
(Exhibits 1, 2 and 3 will be marked for identification.)
BY MR. BISHOP:
Q Dr. Compton, let me ask you a few questions about your CV.
You're not a mineralogist, correct?
A That's correct.
Q And you received a Ph.D. in physics from the University of Georgia in 2009.
Could you just give us the executive summary of what your dissertation was in.
A My dissertation was on the fabrication and characterization of a specific kind of phosphor material. It was detailing the steps required to develop the material as well as the microscopy and spectroscopy involved in investigating material.
Q Now, as I understand it, your first experience with the analysis of asbestos content of various products and material occurred after you obtained your Ph.D. and began employment with MVA,



correct?
A That's correct in terms of any studies specific to asbestos.
Q And as you've testified to before, the health potential of any of the exposures that you have found in any of the studies you've done at MVA or any of the bulk analyses you have performed or participated in is not within your field of expertise, correct?
MR. KUNIN: Objection to form.
A I won't be providing any medical opinions, if that's what you're asking.
BY MR. BISHOP:
Q Will you be providing any opinions -- let me rephrase the question.
As I understand it, you did not receive any specific risk-assessment training in college, including the time spent preparing for your Ph.D.
A That sounds accurate.
Q In your employment at MVA, have you ever authored or participated in any specific study involving risk assessment?
A Not beyond the studies that we conduct evaluating airborne fiber concentrations of asbestos.
Q And is it fair to state that if we look at



your CV, there's no reference on your CV to any specific training you received after you obtained your Ph.D. physically on the subject of risk assessment?
A No, there's some classes that I've taken that relate to industrial hygiene on the topic of asbestos but nothing that's exclusive or specific to risk.
Q All right. In prior depositions you've indicated that any risk assessment opinions you intend to offer are limited to risk of exposure as opposed to medical risk. Is that still the case in the Doolin matter?
A That sounds accurate.
Q As I understand it, you have one publication in the scientific publication that specifically addresses asbestos.
A Two.
Q Two. Okay. The first one is entitled Airborne Asbestos Exposure -- Oh, I take that back. I apologize.
The first one is "Analysis of Vermiculite for Asbestos and Screening for Vermiculite" from Libby, Montana?
A That's the most recent one, yes.
Q All right. And then the second one is



entitled "Airborne Asbestos Exposure from" -- is that "Gooch Fiber Use"?
A Yes.
Q And what is that?
A It's a raw asbestos, typically amphibole, mineral that was sold and distributed to laboratories for the preparation of Gooch filters. It's essentially a substrate that a scientist could put a material on, weigh it, heat it and weigh it again to determine properties of gravimetric reduction.
Q Referencing your CV, and specifically page 3, there's a section entitled "Presentations/Unpublished Works."
Could you tell us just a little bit about the presentation entitled "Encapsulation Within Asbestos-Containing Materials: Facts or Myths," on the bottom of page 3?
A Sure. I should probably clarify that I'm looking at a copy that's a little bit updated, but that presentation is still on the copy that I'm looking at.
But the title or the talk involved sharing with the conference proceedings some of the research that I've done on asbestos-containing materials, a variety of different asbestos-containing materials.

Some of those included asbestos cement pipe and boards, asbestos-containing friction materials, and there are other products as well. I just don't recall off the top of my head.

But the gist of the talk was a microscopic examination of those materials to determine if the asbestos that was contained within them was totally and completely encapsulated, or if there were fibers that were on the surface or protruding from the edges that were un-encapsulated.

Q Now, you mentioned that you have a more recent version of your CV. Ours is dated March 31, 2017.

Are there any significant changes in your CV since the March 31, 2017 version?

A It would essentially be an update to the Presentations and Unpublished Works section as I continue to give talks on the topic of asbestos.

Since that time I've given probably two talks that relate to the topic of asbestos. One in late March regarding re-suspension of settled asbestos dust. It was an evaluation of settled dust and possible means of re-suspension or re-entrainment either through clean-up activities at the site, the source point of exposure, or clean-up



activities at another location from portable objects like clothing and laundering. That is something considered a take-home exposure.

The other talk that I gave this year, since that date, would have been in August of this year. That was on the evaluation of friction materials for asbestos and an investigation of fiber release.

Q Is there anything specific about either of those presentations that you intend to rely upon in expressing opinions in the Doolin matter?

A I don't believe that there would be any new information. It wouldn't change any of my opinions, but I'm more than willing to share a copy of the PowerPoint from that friction talk that I gave, if that's something that would be helpful.

Q Yeah, I'd appreciate your willingness to do so. And we'll mark that as Exhibit 4. At your convince, if you can provide that to Marc and Marc can in turn provide it to the court reporter.

(Exhibit 4 will be marked for identification.)

BY MR. BISHOP:

Q Again referring to your CV, there's a presentation from April 2015 entitled "Comparison of



Erionite from Different Locations by Scanning Electron Microscopy." Could you just give us a brief summary of what that presentation was about.

A Again, erionite is a fibrous material and it can be found in certain specific locations in the world. It's one of the family of zeolites. And a characterization of that mineral is something that is of increasing interest.

This particular talk related to my characterization of various sources of erionite from the U.S. and internationally.

Q Did it involve -- let me rephrase the question. So you had specimens from various locations, both in the U.S. and internationally, to examine by scanning electron microscopy?

A That's right.

Q A little farther down under the presentation "Unpublished Works" section, there's a reference to "The Microscopy of Asbestos Products: Case Study of the Unique and Interesting."

Could you give us just a capsule summary of that presentation?

A I can. This is a talk that I gave on a couple of different cases. Once at Inter/Micro in Chicago and then also at a meeting of a Georgia



Microscopical Society here in Georgia. And the talk involved an overview of the instruments and methods that are commonly used for investigating asbestos in materials and in air.

I gave an overview of those different instruments, what they were used for, and their applications in terms of methods that required their use. And the talk itself is part of my general asbestos binder.

Q And then, finally, on this section of your CV there's a reference to a presentation at the Johnson -- ASTM Johnson Conference in Burlington, Vermont in July of 2011, entitled "A Case Study of Asbestos Exposure in the Laboratory."

Can you briefly summarize the subject of that presentation.

A That presentation related to the work I had done on Gooch fiber asbestos. The bulk characterization of a variety of different materials as well as a fiber release study using one of those materials.

Q You're not an epidemiologist, correct?

A That's correct.

Q Have you ever participated in an epidemiological study?

A Not that I can recall.
Q And you've been asked in the past about the fact -- about whether you're an industrial hygienist. You're not a certified industrial hygienist, correct?
A That's correct. I'm not a certified industrial hygienist, but a lot of the work that I do relates to the topic of industrial hygiene specifically in the field of asbestos.
Q Fair enough. In prior depositions you've indicated you would defer to a certified industrial hygienist for calculations of either an eight-hour time-weighted average exposure estimate for a particular plaintiff or a particular plaintiff's cumulative -- estimated cumulative exposure to asbestos in fiber per cc years.
Is that the same in this case or is it different?
MR. KUNIN: Objection. Form.
A It's basically the same but I should probably break it down to be more clear.
BY MR. BISHOP:
Q Okay.
A I'm not providing any opinions with respect to fibers per cc years or doses for any particular product or for an overall lifetime dose.



My opinions will be expressed in terms of airborne fiber concentrations, fibers per cc, preferably.
I have been asked questions about eight-hour-time-weighted averages before in deposition and in trial. I prefer to provide that data in terms of peak exposures or exposures evaluated during the time period that the activity actually takes place as opposed to diluting them over an eight-hour time-weighted average because there's information that is needed in order to evaluate that appropriately.
And so if I were asked about that, I'm fine commenting on that, but it's not something that I would anticipate providing any testimony in terms of an eight-hour time-weighted average.
Q And is it fair to state the exposure studies from MVA that you intend to rely upon in the Doolin case are likewise peak exposures as opposed to time-weighted averages -- eight-hour time-weighted averages?
A That's correct.
Q Do you have any specific training in toxicology?
A No.



Q Have you reviewed any animal inhalation studies involving exposure to brake dust?
A I don't believe so.
Q And in the past you've indicated that you don't consider yourself an expert on warning labels.
In this case, do you intend to offer any opinions about language that should appear on warning labels and when warning labels should be placed on brake products?
A I don't anticipate that, no.
Q I think in your curriculum vitae it mentions you're a member of the American Industrial Hygiene Association. Is that still the case?
A No, it does not say that.
Q Okay. I apologize.
When was the first time, once employed at MVA, that you did any analysis by phase contrast microscopy in any asbestos samples?
A It would have been sometime around September of 2012.
Q Do you plan to use any videos in your trial testimony in the Doolin case?
A Some of the MVA studies that have been conducted were videotaped, and those are available if that's something that we need to address.



At this time I don't believe I've received a request one way or the other, so I -- not that I anticipate but I don't know.
Q What's your trial current hourly rate for reviewing cases and providing testimony?
A For deposition and trial testimony it's 550. For reviewing materials or any other general hourly labor, it's 375.
Q As I understand it you are now a part owner of MVA?
A That's correct.
Q And roughly what is your percentage of the ownership of MVA, if you know?
A I don't.
Q In the past, and I'm referring to a deposition in September of 2016, you indicated that in addition to receiving a salary, you received compensation by way of a commission based on the projects -- all the projects that you work on. Is that still the case?
A It is.
Q Do you have an estimate of what percentage of your annual income from MVA is related to commission as opposed to salary?
A No.

Q And besides that, you've got TWA. Do you contend that's an eight-hour TWA?
A I don't recall.
Q The reference to Johnson, a study entitled "Industrial Hygiene Assessment of Seven Brake Serving Facilities" in 1979. There's some references there to TWA numbers.
Do you know whether those refer to eight-hour TWAs or something less than eight hours?
A If I recall correctly it's a mix of both. There's a statement in their discussion section that indicates that most of the reported TWA exposures are based on sampling times less than eight hours. Usually three to eight hours.
Q Are there any particular activities identified on Table D-3 that you think are applicable to the Doolin case?
MR. KUNIN: Objection to form.
A To the extent there was testimony of removal and replacement and sanding of friction linings, I would, for those topics specifically, refer to the exposures that relate to removal and replacement or surface abrasion.
But I understand there would have likely also been some clean-up work involved. I understand



I might be provided with hypotheticals at the time of trial.
BY MR. BISHOP:
Q As of today, have you been provided with any hypotheticals to evaluate?
A No.
Q The three MVA studies that are included in the Appendix D references, all of the concentrations identified in those studies are peak exposures for specified periods of time that are set forth in the study?
A They are, and we've done a number of other studies as well that show similar results.
Q Let me ask you some questions regarding your experience with brakes.
As I understand it, you don't have any formal education in the area -- in the specify area of auto repair?
A That's correct.
Q And that would encompass brake repair work as well, correct, no specific educational experience?
A No educational experience, that's correct. It's something I have done research on but nothing from my educational background.
Q And in prior depositions you indicated that



you had done one brake job and that was -- in fact, without my stating it, do you recall when -- let me rephrase the question.
Have you done more than one brake job in your experience?
A I have.
Q When is the first brake-replacement activity you specifically either performed or helped perform?
A I'd have to think about it, but as of right now, it would have been sometime in the mid to late '90s.
Q Do you recall whether it involved disc brakes or drum brakes or a combination?
A A combination.
Q And what do you recall doing on that occasion?
A Just a general overview or a step-by-step procedure?
Q A general overview.
A I seem to recall replacing the front-end disc brakes and inspecting the rear brake drums.
Q And did you do any sanding or grinding or beveling in connection with any brake-replacement work on that occasion?
A I don't recall.



Q Do you recall the brand name of any of the brakes involved in that brake replacement?
A Not as I sit here today. I'd have to think about it.
Q Is it fair to state that you've never done any feasibility studies about the use of non-asbestos materials in brakes or clutches?
A That's correct.
Q And is it fair to say that you have not conducted any studies on the surface chemistry of any asbestos fibers release during the grinding of new brakes?
A Not beyond the steps that are typically taken in characterizing airborne asbestos fibers.
Q And would the same be true for brake-wear dust, that is if the brake dust is generated as a result of the braking process, you haven't done any specific studies on the surface chemistry of any of the asbestos fibers in brake-wear dust?
MR. KUNIN: Objection. Form.
A Nothing beyond the typical microscopic examinations that are required for bulk asbestos determinations, no.
BY MR. BISHOP:
Q Have you, yourself, done any specific air

sampling of brake-replacement activities outside of the laboratory studies conducted by MVA?
A Myself and others here at MVA conducted a study in a warehouse that was used for brake replacement. I don't know if that's something that you consider a laboratory study or not, though.
Q And when was that study conducted?
A 2013.
Q And describe generally what the -- what you were studying.
A It was a brake-removal process involving the removal of brake shoes from a 1975 Toyota Corolla. It involved having the Toyota Corolla in a small warehouse that had been converted to an abatement-style chamber. And a certified industrial hygienist and a mechanic were on hand to perform the activity and collect air samples involved in removing the brake shoes from one wheel of the vehicle with use of compressed air to clean out the dust from the brake assembly.
Q Have you ever done air sampling of brake replacement conducted outdoors?
A No.
Q You're not aware of any air sampling done where examination of the brake dust resulted in



tremolite being observed?
A Can you repeat that?
Q Sure. That was a bad question so let me start over again.
Are you aware of any air sampling done on brake dust where tremolite was observed?
A The answer is, yes, but I'm trying to recall what study it was because I'm guessing that's going to be your follow-up questions.
Q That's a good guess.
A I might need to think about that and come back to that.
Q Okay. Have you systemically reviewed the scientific literature for epidemiological studies analyzing brake work and vehicle mechanics and risk of mesothelioma?
A It's not something I anticipate providing any opinions about so, no.
Q In the list of references that's included as part of Appendix D -- I apologize. It's not appendix D. It's actually in Appendix E.
Under Number 14 under "Asbestos General Information" index, February 2016, the roll-off study is listed.
Why did you list one epidemiology study



and why was it the roll-off study?
MR. KUNIN: Objection. Form.
A I don't recall.
BY MR. BISHOP:
Q Would you agree that Richard Doolin's potential exposure to brake dust was principally as a bystander based upon your review of his father's deposition transcripts?
MR. KUNIN: Objection. Form.
A It was my understanding that it would have involved both work that he did himself as well as a bystander.
I don't know that I could provide any testimony about which would have been more prevalent than the other.
BY MR. BISHOP:
Q If we wanted to see the impact of distance from point source of admission, one of the studies that would provide -- or one of the reviews that would provide information on that is the Donovan paper which you reference in your Asbestos General Information index entitled "Evaluation of Bystander Exposures to Asbestos in an Occupational Setting," correct?
MR. KUNIN: Objection. Form.
A That would be a conservative approach. I



would also rely on specific bystander-area samples that might be available in different exposure investigations that have occurred.
BY MR. BISHOP:
Q And those would be the studies that are listed in Appendix D under Friction Product References?
A That's correct.
Q In the past you were asked whether you were familiar with Dr. Arthur Langer's publication in 2003. The transcript that I read indicated you hadn't seen it.
Had you seen Dr. Langer's publication published in 2003 more recently?
A That doesn't sound familiar, no.
Q You have also been asked in the past about Dr. Paustenbach's industrial hygiene review entitled "In Evaluation of the Historical Exposure of Mechanics to Asbestos in Brake Dust." It was published in the Applied Occupational and Environmental Journal in 2003.
Have you had an opportunity to review that article?
A It doesn't sound familiar.
Q Would you agree, Dr. Compton, that there are

no peer-reviewed published study that show the tremolite or actinolite fibers from friction products made it into the breathing zone of a motor vehicle mechanic?
MR. KUNIN: Objection. Form.
A Not that I can recall as I sit here today.
BY MR. BISHOP:
Q Would the same be true for a bystander, that is somebody who wasn't the actual mechanic but happened to be in the vicinity?
MR. KUNIN: Object to form.
A Not that I can recall, but I did recall the MVA study that found tremolite in an air sample.
BY MR. BISHOP:
Q All right. If you could identify that.
A It's MVA project 8219. And our report is entitled "Fiber Release During Activities Involving Grizzly Brand Brake Shoes." That report is dated November 9, 2010.
Q Reviewing the testimony of Mr. Doolin's father, did you see any reference to Grizzly brakes?
A Not that I can recall, no.
Q Other than the study of Grizzly brakes performed by MVA in 2010, can you identify any study that MVA has conducted where they detected tremolite



fibers in air sampling from brake-replacement activity?
MR. KUNIN: Objection. Form.
A Nothing that I can recall at this time.
BY MR. BISHOP:
Q Did you receive any corporate documents or corporate information for any of the defendants in the Doolin case as part of your work for the Doolin case?
A No.
Q Referring again to your report, does that fairly summarize the opinions you expect to offer in the Doolin matter?
A Without speculating what might be asked of me at the time of trial, it does, yes.
Q Referring to that report on the second page, under Number 4 opinion about Dr. Doolin's exposure to friction product, the sentence that reads, "Dr. Doolin was exposed to significant levels of asbestos fibers in his breathing zone while working with and around others working with asbestos-containing friction products."
And then you go on to say that he included those manufactured by various folks. That Dr. Doolin either personally worked on or was a bystander, as testified by Richard's father, Edward



Doolin.
What do you mean by the phrase significant levels of asbestos fibers?
MR. KUNIN: Object to form.
A By that I mean greater than ambient levels that had been reported.
BY MR. BISHOP:
Q Do you have any specific information -- let me rephrase the question.
Do you have any information specific to the Doolin case as to the asbestos content of any of the particular brands of brakes that Edward Doolin testified to in his deposition transcript?
MR. KUNIN: Objection to form.
A I'm not sure I understand your question.
BY MR. BISHOP:
Q Let me start out this way: Has MVA or have you conducted any studies or bulk sample analysis of any brakes that Edward Doolin specifically used or replaced?
MR. KUNIN: Objection to form.
A Not on the same exact material that he personally installed on a vehicle or removed from a vehicle, no.
MR. BISHOP: Dr. Compton, I think those are



all the questions that I have. It's possible I'll have one or two once the other folks on the phone have an opportunity to ask you questions. Thank you very much for answering my questions.
THE WITNESS: You're welcome.
CROSS EXAMINATION
BY MS. COLE:
Q Dr. Compton, my name is Susan Cole and I have some questions for you. Do you need a break?
A I'm fine but I think we should check in with the court reporter.
THE COURT REPORTER: Thank you. I'm fine.
BY MS. COLE:
Q I want to start, sir, by asking you a little bit about this work on the Gooch fibers that you talked about very early today.
Are you talking about a specific asbestos fiber that's called Gooch?
A It could be any number of different amphibole mineral types that were packaged and distributed or sold to containers labeled "asbestos for Gooch fiber use."
Q Are you familiar with the term Gooch crucible?
A I am.

Q Does a Gooch crucible contain an asbestos-containing Gooch fiber mat?
A Not inherently, no. It's a device that you would take some of this Gooch fiber and apply it into the bottom of it in order to fabricate such a filter for a mat.
Q And you would add this Gooch fiber -- Gooch asbestos fiber to an empty Gooch crucible in the -- you'd add it in the form of a slurry and it would dry it to a mat.
A I've seen descriptions of it being added as a slurry and also of it being added as a dry material.
Q Would you agree, sir, that part of the undergraduate curriculum at most universities in chemistry classes for quantitative analysis and qualitative analysis contain experimentation by students of materials using a Gooch crucible with a Gooch fiber mat?
MR. KUNIN: Objection. Form.
A I can't speak beyond my own experience, but it's not something that I did as an undergraduate.
BY MS. COLE:
Q Did you take quantitative analysis in chemistry as an undergrad?
A Not as an undergraduate, no.



Q Would you agree that in the biological sciences that it was common that a Gooch crucible would be used in the laboratory education of undergraduate science students?
MR. KUNIN: Objection. Form.
A I can't say one way or the other.
BY MS. COLE:
Q Okay. To the extent that Gooch fibers were used to line a Gooch crucible for gravimetric analyses in a laboratory, that would necessarily expose individuals to asbestos through the use of these fiber mats, true?
MR. KUNIN: Objection. Form.
A It would depend on the activities that were taking place.
BY MS. COLE:
Q What do you mean by that?
A The --
MR. KUNIN: Objection. Form.
A Through the individual performing some kind of an activity that would result in a release of asbestos, are they creating these mats in a dry manner? Are they disturbing them after they've been heated and dried out? Those are the kinds of questions that I would need to be able to address.



BY MS. COLE:
Q The study that you did involving the Gooch fiber, did that involve Gooch fibers in use or was that just Gooch fibers out of a bag?
A That involved taking a container of fibers, placing them in the bottom of a dish and pressing them into a mat.
Q What type of exposures of asbestos were involved in that activity?
MR. KUNIN: Objection. Form.
A That activity resulted in an airborne fiber concentration of approximately one fiber per cc.
BY MS. COLE:
Q At the time that the study was done, was that an allowable asbestos exposure under OSHA?
MR. KUNIN: Objection. Form.
A I don't know.
BY MS. COLE:
Q Okay. I want to talk to you now, sir about your report, and I want to specifically ask you some similar questions to what Mr. Bishop asked you, but this time I want to ask it to you about clutch work.
In your work at MVA, was there a study performed on Borg-Warner clutch material?
A Yes.



MR. KUNIN: Objection.
BY MS. COLE:
Q I'm sorry. I did not hear your answer.
A Actually, I think I might have missed part of your question, so it would probably be better if I asked you to repeat it.
Q Sure. You began at MVA in 2009. You list on one of the entries on Exhibit D a study done on Borg-Warner clutch material.
Had that study, the study itself, been done before or after you began employment at MVA?
MR. KUNIN: Objection. Form.
A After.
BY MS. COLE:
Q Did you participate in that study?
A Yes.
Q Would you agree with me, Dr. Compton, that that study did not measure fiber release during manipulation of clutch material?
A That's correct.
Q Would you agree with me that no air sampling was made during the manipulation of the clutch material in that study?
A That's what I assumed your last question meant, but I should say in terms of fiber release

there was an investigation into release through contact with the clutch material.

Q Let me reask the question. Did that study involve any measurement of release into the air of fibers as a result of manipulation in that clutch study?

MR. KUNIN: Objection. Form.

A No.

BY MS. COLE:

Q Did that study involve a bulk analysis of the clutch material?

A It did.

Q In the bulk analysis, would you agree that what was done was to cut into a bit of the clutch facing and analyze what was physically taken out of that clutch facing by use of the electron microscope?

MR. KUNIN: Objection. Form.

A That's part but not all of what we did.

BY MS. COLE:

Q What was done in terms of the bulk analysis in the clutch facing?

A The bulk analysis involved examination of the clutch materials by stereo microscopy or as light microscopy and transmissional electron microscopy supplemented by some scanning electron microscopy of



particles that were transferred onto an analyst's skin.

Q Was the transfer of the materials part of the bulk analysis or was that another phase of the test?

A It's an analysis of bulk material that has been released through contact so it relates to both topics.

Q Okay. In the study that was done where electron microscopy was used, was that only in the part involving the transfer of material to the analyst's skin?

A That's true for scanning electron microscopy. For transmission electron microscopy, what was done was an acid-based digestion to detect whether or not any amphibole minerals were present in the bulk sample.

Q And the bulk sample was what was actually physically cut out of the clutch facing. True?

A Either -- you're saying "cut out." I don't know that "cut out" would be the right way to put it. It would have been extracted using some kind of a rasp or some material to collect a representative subsample of that friction lining.

Q In the test that was done on the sampling,



how was the material transferred to the analyst's skin?

A It was by touching a finger to the surface of the friction lining.

Q Sort of taking a swipe of the finger over the surface of the friction lining?

MR. KUNIN: Objection. Form.

A Not a swipe, just pressing down and looking up.

BY MS. COLE:

Q And then that material was then transferred to a plate where the analysis could be performed?

A Correct. It's an aluminum disc that has a conductive layer of carbon, an adhesion on top.

Q So it's sticky on the top. The finger was placed on top of the sticky plate and then the finger was removed?

MR. KUNIN: Objection. Form.

A To collect any material that was on the finger, correct.

BY MS. COLE:

Q Okay. Of the material that was collected on the plate from the finger, how many of those fibers were longer than five microns in length and within the width parameters to be calculated as a NIOSH 7200



countable fiber?

MR. KUNIN: Objection form.

A For this kind of analysis, it doesn't include counting individual fibers because typically what you're looking at is comprised of vast number of individual fibers. It's a more qualitative characterization of material that is released, if any.

BY MS. COLE:

Q By qualitative you mean determination of: Was there asbestos there; was there not asbestos there, but not counting how much?

A Correct.

Q Is any of the testing that was done on this clutch-facing plate similar in any regard to what was described by Mr. Edward Doolin in his deposition?

MR. KUNIN: Objection. Form.

A I'm not sure I'm understanding your question. You're asking in terms of the nature of the product or the activities involved in the bulk sampling of a material?

BY MS. COLE:

Q I'm talking about the activities involved in the sampling test that MVA did.

Did Richard Doolin or Edward Doolin do any of that stuff as described by Edward Doolin in his

46

deposition?
MR. KUNIN: Objection. Form.
A In terms of performing microscopic examinations of any friction materials, I'm not aware that he did anything like that. And in terms of handling friction materials, yes, it's my understanding that both of them worked with and handled various types of friction materials from various manufacturers.
BY MS. COLE:
Q Can you point me to any place in any deposition where Richard Doolin is described as handling a clutch-facing?
MR. KUNIN: Objection. Form.
A I recall that Mr. Doolin was asked if his son did any work with clutches, but I'd have to check the testimony to see what the wording is. I don't recall if he was asked the specifics of how he handled those samples.
BY MS. COLE:
Q Are you aware of any epidemiological studies that relate work -- a lifetime or a portion of a lifetime of work with clutches to the contraction of malignant mesothelioma?
MR. KUNIN: Objection. Form.

47

A I would consider that outside my scope of expertise. I don't know that I can answer that one way or the other.
BY MS. COLE:
Q Are you prepared to -- strike that.
Do you have any opinions that you expect to testify to about the amount of fiber release, if any, that was experienced by Richard Doolin's handling of clutch-facing material?
MR. KUNIN: Objection. Form.
A In terms of a specific number, no, not from handling alone.
BY MS. COLE:
Q Are you familiar with any studies that measured the use of compressed air on clutch-facing material to determine fiber release from those materials?
A There are a number of studies that have addressed the use of compressed-air and removal and replacement of friction materials, generally speaking. I don't recall if there's anything specific to clutches.
Q You do agree that a clutch is different than a brake, right?
MR. KUNIN: Objection. Form.

48

A There are differences and similarities.
BY MS. COLE:
Q Have you examined those differences and similarities yourself?
MR. KUNIN: Objection.
A I have.
BY MS. COLE:
Q Is there a study that details that?
MR. KUNIN: Objection.
A There are dozens of MVA reports relating the bulk analyses of various brake and clutch materials that myself and my colleagues at MVA have analyzed.
BY MS. COLE:
Q What are those differences?
MR. KUNIN: Objection. Is your question: What are the differences between brakes and clutches? Is that your question right now?
MS. COLE: Sure. Because he's conflating --
MR. KUNIN: There is not conflating. Just ask concise clear questions.
You can't just ask him what's the difference between a clutch and a brake. Like, are you serious? We'll be here all day. I can tell you the differences.
BY MS. COLE:

49

Q Are you prepared to testify, Dr. Compton, about any quantitative assessment of fiber release from a clutch during the use of compressed air?
A I am prepared to share with the court the results of a variety of different studies that investigated compressed air use on friction materials, generally, most of which are specific to or focused on brake work.
Although, I have investigated friction linings from both brakes and clutches. And it's my opinion that the friction linings are comprised of a certain percentage of asbestos in addition to a number of other ingredients, resins, and other filler materials.
And the dust from new and used friction materials, meaning dust from a friction material prior to installation, as well as wear dust from the use of a clutch or brake have similar properties to each other.
Q The clutch facing that was studied by MVA by Borg that we were talking about, the Borg material that was produced for the study, how old was that material? How long ago had it been manufactured?
A I don't recall.
Q Do you know how the material was stored

between the time it was manufactured and the time that MVA got it to examine it?
MR. KUNIN: Objection. Form.
A Not that I can recall.
BY MS. COLE:
Q Do you know where that material came from? In other words, who had it during the time between its manufacturer and the time it was delivered to MVA?
A Not that I can recall from memory.
Q Do you know if that material had been manipulated by anyone else prior to MVA obtaining the material?
A If it had -- if it had, there were no markings or evidence of any such manipulation.
Q But do you know one way or the other?
MR. KUNIN: Objection.
A Based on our investigation of the material, I don't see any evidence that would suggestion that it was.
BY MS. COLE:
Q From where did you get the material? Do you know the name of the lawyer that delivered the material to MVA?
A I recall that it was for a case involving the Early Law Firm.



Q E-a-r-l-y, out of Massachusetts?
A That's correct. Connecticut.
Q Okay. Has that study been published?
A Not that I'm aware of.
Q Has that study ever be been submitted for publication?
A Not that I'm aware of.
Q Has the finger test or the finger transfer of materials ever been accepted as a method of study for asbestos-containing materials in any peer-reviewed scientific reviewed?
MR. KUNIN: Objection. Form.
A As a general concept, the idea of looking at trace materials transferred through contact was established in the early 1900s by a gentleman, the last name Locard, L-o-c-a-r-d, who is considered one of the founding fathers of forensic science, so it's by no means a novel procedure.
But is it specific to looking at asbestos-containing materials, I don't recall if there are any papers that address that that I can think of off the top of my head.
BY MS. COLE:
Q Now you sat on a number of committees --
A I'm sorry. I'm not done.



Q Oh, I'm sorry. On the phone I can't tell. Go ahead and finish.
A It's not something that most bulk asbestos laboratories would have need to address in terms of determining the asbestos content.
Q Is it true that most laboratories do not use this finger transfer technique?
MR. KUNIN: Objection. Form.
A When it comes to asbestos analysis, most routine laboratories don't have to address the assertion that asbestos is encapsulated or not.
But when it comes to laboratories investigating trace evidence, generally speaking, it is not an unfamiliar procedure.
BY MS. COLE:
Q Are you aware, sir, of any laboratory, other than MVA, in analysis for asbestos that uses the finger transfer technique in its routine analysis?
MR. KUNIN: Objection. Form.
A In terms of the instrumentation and methodology that's used to analyze those particles, using a common technique that most laboratories would also use but not in terms of the sample collection. It's not something that I'm familiar with specific to asbestos.



BY MS. COLE:
Q So MVA is the only one that uses that particular method?
MR. KUNIN: Objection. Form.
BY MS. COLE:
Q Is that true?
MR. KUNIN: Same objection.
A In general, absolutely not. But as far as I'm aware, we're the only laboratory that's investigated the specific question of asbestos encapsulation using that generally accepted technique of trace evidence.
BY MS. COLE:
Q Now I started to ask you some questions about the length and width of fibers that were analyzed as a result of the study on the clutch facing that MVA did, and I'm not sure if you gave me an answer.
Can you tell me, sir, if any of the fibers that were obtained and studied individually for counting purposes were longer than five microns and between 1.25 microns?
MR. KUNIN: Asked and answered.
A You did ask me that. I told you that it was not counting -- the fiber counting procedure that

to you means above ambient levels that had been reported; is that correct?
MR. KUNIN: Don't answer the question. Follow-up questions only.
MR. WAINGER: Well, that's the predicate to my next question.
MR. KUNIN: What's your next question?
BY MR. WAINGER:
Q My next question is: Is significant a term of art or is that your term?
MR. KUNIN: Objection. Form.
A I'm not sure I understand what you're asking.
BY MR. WAINGER:
Q Sure. Doctor, the way you used the term significant, is that defined in any of the peer-reviewed literature to mean the way you're using it?
MR. KUNIN: Objection. Form.
A I don't know whether it is or not.
BY MR. WAINGER:
Q So you can't cite for me any of the peer-reviewed literature where some other industrial hygienist or someone in your field uses the term significant the same way you use it?



MR. KUNIN: Objection. Asked and answered.
A In terms of the detection of asbestos from a microscopic point of view, whether or not you can detect a particle and count it is what I would consider significant.
So my characterization of significant relates to the detection of asbestos. And to put that into context, I compare it to ambient levels that had been reported. So it's something that is used in terms of microscopic analysis. I don't know that I can answer that in terms of a medical or a risk-base significance.
BY MR. WAINGER:
Q Right. You're not a medical doctor so you're not using the word significant to mean medically significant or causative of disease, correct?
MR. KUNIN: Objection. Form.
A That sounds accurate.
BY MR. WAINGER:
Q So is it your testimony that any exposure where you can find fibers is significant in terms of your opinion?
MR. KUNIN: Objection. Form.
A Any evaluation of an activity where asbestos



released into the air can be detected, yes, I would consider that significant.
BY MR. WAINGER:
Q Can you give me some idea of the methodology for performing that opinion?
MR. KUNIN: Objection. Form.
A In microscopic analyses we have things called analytical sensitivities that have established the limit to whatever test you're providing.
These are essentially parameters that an analyst can provide to give someone who's looking at the data an understanding of more or less how hard they looked.
So the methodology would be evaluating what those analytical sensitivities are and comparing those to ambient levels that have been reported by government agencies.
BY MR. WAINGER:
Q What are those in this case?
A For --
MR. KUNIN: Object to form.
A The levels that have been detected in the studies I would refer you to the studies themselves, but for the ambient levels, the reported range from the ATSDR is between .001 fibers per cc and 0.0001



fibers per cc with some variability depending on urban or rural environments.
BY MR. WAINGER:
Q But you don't know the ambient levels of the Team Challenge garage, do you?
A Not more specifically than the ambient levels that could have been reported generally by the ATSDR, no.
Q Is it your testimony that if the exposure is significant, it is still within the applicable permissible exposure levels or limits?
MR. KUNIN: Objection. Form.
A I don't anticipate presenting any opinions with respect to permissible exposure limits.
BY MR. WAINGER:
Q That's not my question, Doctor.
Is an exposure significant even if it's within the applicable PEL?
MR. KUNIN: Objection. Form.
A It can be, yes.
BY MR. WAINGER:
Q How?
MR. KUNIN: Objection. Form.
A If the value is less than whatever value you're quoting as the permissible exposure limit, that

would be the situation.
BY MR. WAINGER:
Q I don't understand that answer, Doctor, so maybe you can take me through it again, and explain to me how an exposure within the applicable PEL at the time is significant as you use the term?
MR. KUNIN: Objection. Form.
You've got to be more specific with your question. He already said he's not talking about permissible exposure limits and I'll stipulate to that.
BY MR. WAINGER:
Q Doctor, do you understand the question?
A I don't know that I do.
Q Let's walk through it then.
If you have any kind of exposure where asbestos fibers are released but that exposure is still within the permissible exposure level --
MR. KUNIN: What permissible exposure level?
MR. WAINGER: The applicable one at whatever time you choose.
MR. KUNIN: No. You're the one asking the question. You choose. He's not talking about it. It's outside the scope. I'm not bringing it up at trial. So if you want to be specific and



ask about a permissible exposure level, you have to give the actual fiber per cc.
MR. WAINGER: All right. Why don't you just state your objection and the grounds for the objection and let's have enough of the speaking objections because that's what's really delaying this matter.
MR. KUNIN: No, what's delaying it is your poor question. I'm trying to advance this deposition, and I'm telling you why your questions don't make sense so that we can try to move forward and streamline this.
BY MR. WAINGER:
Q Doctor --
MR. KUNIN: It's becoming harassing.
BY MR. WAINGER:
Q Doctor, do you understand that an exposure with use of an asbestos-containing product can be within the permissible exposure limit, whatever limit you choose. Let's say .1. Okay? Do you understand that?
MR. KUNIN: Objection. Form.
A I don't understand. What are you asking me to understand?
BY MR. WAINGER:



Q I want you to assume that the applicable permissible exposure limit is .1. Okay? Now, if you have use of an asbestos-containing product that comes in below that permissible exposure level, is that exposure still significant as you use that term?
MR. KUNIN: Objection. Form.
A If it's above the ambient levels that had been reported, then, yes, that's how I'm defining significant.
BY MR. WAINGER:
Q Okay. But my question then is why?
MR. KUNIN: Objection. Form. Asked and answered.
A I don't know how to answer that without restating what we've already established, which is what my definition of significant is.
BY MR. WAINGER:
Q So is it then that every exposure above ambient level is significant to you?
MR. KUNIN: Objection. Form.
A In attempting to establish what an individual's exposure was, yes.
BY MR. WAINGER:
Q Let's talk specifically about Ford. Are you able to quantify in any way the exposures that Richard



Doolin had to Ford asbestos-containing products?
MR. KUNIN: Objection. Form.
A Yes.
BY MR. WAINGER:
Q Go ahead for me then.
MR. KUNIN: Objection. Form.
A The opinions that I have for Ford asbestos-containing friction materials would be the same opinions that I have for friction materials generally speaking, which is that the specific activities result in varying levels of asbestos concentrations depending on the activity.
And what I would share with the court are those ranges that have been reported in the report and studies that we've talked about so far in this deposition. If there's information in those studies relating to bystander exposures, then I would defer to that specifically and relate that to Dr. Doolin's situation, if you were not the individual performing the work. But the --
Q You said --
A -- it would be based on those airborne fiber concentrations for the relevant activities to this case.
Q Doctor, what I'm really looking for is

whether you have information regarding the number of times that Richard Doolin was exposed to Ford asbestos-containing products and the frequency of those exposures.

MR. KUNIN: Objection.

A No, that's not something -- that's not something I'd be providing an opinion about one way or the other.

BY MR. WAINGER:

Q Is that a factor in rendering your opinion at all about the frequency of exposures?

MR. KUNIN: Objection. Form.

A Not in any way that I can anticipate, no.

MR. WAINGER: Thank you, Doctor. I have no other questions.

MR. KUNIN: All right, Doctor, you have the right to read or waive the reading of the deposition transcript. Since we're doing it over the phone, I would recommend that you read it, but it's up to you.

THE WITNESS: I typically prefer to read it.

MR. KUNIN: Okay. Perfect.

(Exhibit 5 will be marked for identification.)

(Deposition concluded at 3:27 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, the undersigned authority, certify that STEVEN PATRICK COMPTON, PH.D., personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 19th day of October 2017.

<%Signature%>

________________________________

MARIA E. REEDER, RPR, FPR
Notary Public, State of Florida
My Commission No. GG 073176
Expires: 4/10/2021



CERTIFICATE

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, MARIA E. REEDER, RPR, FPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of STEVEN PATRICK COMPTON, PH.D.; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of October 2017.

<%Signature%>

________________________________

MARIA E. REEDER, RPR, FPR
and Notary Public



ERRATA SHEET

Stacey Doolin vs American Optical, et al.
DEPO OF: Steven Patrick Compton, PH.D.
Date of : October 13, 2017
Case No.: 3:16-cv-0778-MMH-PDB

PAGE LINE REMARKS

________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________

__________________________
Signature of Witness
Dated this _________ day of ___________, __________.

VERITEXT LEGAL SOLUTIONS
One Biscayne Tower, Suite 2250
2 South Biscayne Boulevard
Miami, Florida 33131

October _____, 2017
The Ferraro Law Firm
600 Brickell Avenue
Miami, FL 33131
MARC P. KUNEN, ESQ.

RE: Stacey Doolin vs American Optical, et al.
DEPO OF: Steven Patrick Compton, PH.D.
TAKEN: October 13, 2017
NUMBER OF PAGES: 82
AVAILABLE FOR READING UNTIL: 30 Days

Dear Mr. Kunen:

This letter is to advise you that the transcript of Steven P. Compton, Ph.D. is available for reading and signing.

PLEASE CALL THE ABOVE NUMBER TO MAKE AN APPOINTMENT to come to the Veritext office closest to you to read and sign the transcript. Our office hours are 8:30 a.m. to 4:30 p.m.

In the event other arrangements are made, please send us a notarized list of any and all corrections and/or changes, noting page and line numbers, and the reason for such changes, so that we can furnish respective counsel with a copy.

If the reading and signing has not been completed prior to the above-referenced date, we shall conclude that you have waived the reading and signing of the deposition transcript.

Your prompt attention to this matter is appreciated.

Sincerely,

Maria Reeder, RPR, FPR

VERITEXT LEGAL SOLUTIONS
One Biscayne Tower, Suite 2250
2 South Biscayne Boulevard
Miami, Florida 33131

October 19, 2017

RE: Stacey Doolin vs American Optical, et al.
DEPO OF: Steven P. Compton, Ph.D.
TAKEN: October 13, 2017
NUMBER OF PAGES: 82
AVAILABLE FOR READING UNTIL: 30 DAYS

Dear Mr. Bishop:

The original transcript of the deposition listed above is enclosed for your file. The witness did not waive reading and signing and has been sent a letter notifying them to come in to read and sign their deposition transcript.

The witness will be provided a copy of their deposition for reading in our office should they come in to review the transcript, and we will forward to you any corrections made by the witness at that time, along with an original signature page to be attached to the original transcript.

Sincerely,

Maria Reeder, RPR, FPR