# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| STACEY DOOLIN, as Personal Representative of the Estate of RICHARD E. DOOLIN | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO: 3:16-CV 00778 MMH-PDB |
| PNEUMO ABEX LLC, et al, | ) | |
| Defendants. | ) | |

---

ORAL DEPOSITION OF

EDWARD DOOLIN

VOLUME 2

MARCH 16, 2017

---

ORAL DEPOSITION OF EDWARD DOOLIN, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of March, 2017, from 12:13 p.m. to 2:16 p.m., before Morgan Veletzuy, CSR in and for the State of Texas, recorded by machine shorthand, at Best Western Dayton Inn & Suites, 1751 West Highway 90, Dayton, Texas 77535, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto. That the deposition shall be read and signed before any notary public.

APPEARANCES

FOR THE PLAINTIFF:
Mr. Marc P. Kunen
THE FERRARO LAW FIRM
600 Brickell Avenue
Miami, Florida 33131
Mpk@ferrarolaw.com

FOR PNEUMO ABEX, LLC AND FORD MOTOR COMPANY:
Mr. Henry Salas
COLE, SCOTT & KISSANE
9150 South Dadeland Boulevard, Suite 1400
Miami, Florida 33156
Henry.salas@csklegal.com

FOR BORGWARNER MORSE-TEC:
Ms. Susan J. Cole
BICE COLE LAW FIRM, P.L.
999 Ponce De Leon Boulevard, Suite 710
Coral Gables, Florida 33134
Cole@bicecolelaw.com

FOR HONEYWELL INTERNATIONAL, INC.:
Mr. Kevin J. Parks
THOMPSON & KNIGHT LLP
333 Clay Street, Suite 3300
Houston, Texas 77002
Kevin.parks@tklaw.com



EXAMINATION INDEX

WITNESS: EDWARD DOOLIN


| EXAMINATION | PAGE |
|---|---|
| BY MR. SALAS | 4 |
| BY MS. COLE | 31 |
| BY MR. PARKS | 69 |
| FURTHER EXAMINATION | |
| BY MR. SALAS | 94 |
| SIGNATURE REQUESTED | 100 |
| REPORTER'S CERTIFICATION | 102 |


EXHIBIT INDEX


| | |
|---|---|
| EXHIBIT 2 Amended notice | 8 |




EDWARD DOOLIN,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. SALAS:
Q. Please state your name.
A. Roy Edward Doolin, Sr.
Q. And Mr. Doolin, you go by Ed, correct?
A. Yes.
Q. All right. At times I'm going to call you Ed.
A. Okay.
Q. I don't mean any disrespect. I'm going to try you call you Mr. Doolin most of the time. If I refer to your son, I will refer to him as Rick; is that okay?
A. Okay, that's fine.
Q. And, again, I don't mean any disrespect referring to him by his first name, but it will be very confusing if we just have a bunch Mr. Doolins?
A. Right. Correct.
Q. The other thing is that you can't answer "uh-huh" and "huh-uh." You have to say "yes" or "no."
A. Oh, yes. Okay.
Q. And your attorney explained to you some rules before the deposition started. You're familiar with those rules and comfortable with those rules?
A. Yes.



Q. Okay. What have you done to prepare for this deposition since the last deposition?
A. Nothing.
Q. Did you reread the prior transcript?
A. No.
Q. Did you speak to your wife at all?
A. Yes.
Q. Okay. When --
MR. KUNEN: Well, I hope so.
Q. (BY MR. SALAS) Did you speak to your wife about the deposition?
A. Yes.
Q. What did you discuss with your wife, if you recall?
A. I don't recall specifically. I just told her what -- what had happened and the part that I was involved in. And -- and she told me what she had told you, as much as she could remember.
Q. Did you discuss with her anything about her recollection of the radiation therapy that your son received?
A. We talked about that time period, and she didn't have a whole lot of recollection.
Q. What did you recall -- what do you recall her telling you that -- what was her recollection?

Page 38

not really advanced enough to do something like that,
and they'd be working on brakes and oil changes and
tune-ups and things like you mentioned before. But some
that were -- now, I'm not saying that there might no be
any of them working on it, because some of them would
work on it with me or with one of my assistants. And --
but they wouldn't be in charge of it. They wouldn't --
they would be watching and learning and, you know,
handing wrenches and getting under there, you take that
bolt and that bolt, you know, under specific
instructions, so...
Q. (BY MS. COLE) Do you recall what parts, if
any, were ordered for use in transmission work?
A. For a standard transmission?
Q. Yes, sir.
A. Okay. That would be -- usually be the clutch
plate itself and the pressure plate are two wear items.
And the throw-out bearing were usually ones that were --
were ordered. Usually, the flywheel, if it wasn't too
bad, we'd just put the clutch on it. But if it was
badly stored, we'd -- when the A&G Automotive guy came
around, we'd send a flywheel with him, and he'd bring it
back the next day all cleaned up and polished up. And
that was pretty much the extent of it.
Q. When you were doing transmission work, what was

Page 39

done with the clutch plate and the pressure plate?
A. They would be sent off as cores. You get a
discount for sending a core in, you'd get a -- what did
they call that? A deposit.
Q. Okay.
A. And so we'd sent that in, and then they would
send us the new ones back.
Q. Did you-all install new friction material onto
the clutch?
A. No, only we -- it was all -- it was installed
on the clutch plate when we got it back.
Q. So you at the shop really didn't do any of the
friction material --
A. No.
Q. Let me finish.
MR. KUNEN: Let her finish.
A. I'm sorry.
Q. (BY MS. COLE) You-all didn't do any of the
friction material work on clutches at the shop?
MR. KUNEN: Objection; form.
A. That's true.
Q. (BY MS. COLE) When you got the new friction
material on the clutches back, do you know what brand
names were being installed?
MR. KUNEN: Objection; form. If you

Page 40

understand the question.
THE WITNESS: Oh, okay.
MR. KUNEN: Are you asking about just the
friction material or the clutch itself?
MS. COLE: Let's start with just the
friction material.
Q. (BY MS. COLE) Do you know the name of the
friction material? Brand name?
MR. KUNEN: Objection; form.
THE WITNESS: I'm -- I'm not hearing what
you're saying.
MR. KUNEN: I'm just -- I'm objecting to
it. You can still answer it if -- if you understand the
question.
THE WITNESS: Okay. All right.
A. Okay. You mean, like BorgWarner.
Q. Let's -- let's talk about BorgWarner.
A. Okay.
Q. Do you know of the name of any of the friction
material that was being installed outside the shop and
was coming into the shop already installed?
MR. KUNEN: Objection; form.
A. No, I don't know the name of that.
Q. (BY MS. COLE) Okay. You mentioned BorgWarner.
What do you know about BorgWarner?

Page 41

MR. KUNEN: Objection; form.
Q. (BY MS. COLE) At -- confining it to Teen
Challenge.
MR. KUNEN: Objection; form. "What do you
know about it," is your question?
Q. (BY MS. COLE) Confining it to Teen Challenge,
yes. Your time at Teen Challenge.
MR. KUNEN: Objection; form.
A. I just know it's a brand that's pretty common
and widely used.
Q. (BY MS. COLE) Did you ever order any
BorgWarner parts for Teen Challenge?
A. Not specifically.
Q. Did you ever receive, as a part that you did
order, BorgWarner materials?
A. Yes.
Q. What were they?
A. The clutch plates.
Q. The metal clutch plates?
A. Yes.
MR. KUNEN: Objection; form.
Q. (BY MS. COLE) Did the metal clutch plates
already have the friction materials installed --
A. Yes.
Q. -- on it?

A. I'm sorry. You probably you weren't finished yet.
Q. Did you have -- and I, you know, I was raised in the South and I talk slow. So, please, be patient with me. Okay?
A. Okay.
Q. Did you, at Teen Challenge, have to do anything to the clutch plate or the friction material once you were ready to reinstall it back on the car?
MR. KUNEN: Objection; form.
A. They -- they seemed to work better if you sand it a little bit before you put them on there.
Q. (BY MS. COLE) What kind of sanding was -- are you talking about?
MR. KUNEN: Objection; form.
A. Oh, the -- the friction material. You rub a little bit with some sandpaper before you put it on there and you didn't get that chatter that you a lot of times got when one was really slick. They tended to be really slick when you got them from the -- from the factory.
Q. How -- did -- was sanding something that was done on all of the refurbished clutch plate material that you got back?
MR. KUNEN: Objection; form.



A. I can't recall all of them, but I was -- that's something I did because I found that it worked better that way.
Q. (BY MS. COLE) About how long did you have to sand it?
A. Oh, not long.
Q. Couple of seconds?
A. Yeah, a little bit like that, uh-huh. Maybe a minute.
Q. How often was clutch work being done on cars at Teen Challenge? Was it once a month? Once every six months? Once a day? What's the -- what's the frequency?
A. Probably somewhere between once a day and once a month. And it would vary, you know, it just depended on when one of them needed to be done. But I know we did quite a few of them during the time that I was there, but I can't say that, you know, specific time, can't put a number on it.
Q. Do you know if -- do you know the brand names or manufacturer names with certainty of -- that you were doing the sanding on?
MR. KUNEN: Other than BorgWarner?
MS. COLE: Well, I'm asking if he knows the brand names or trade names.



A. That's the only one I recall. I'm sure they're --
Q. (BY MS. COLE) How do you know that name? Did it come on -- how do you know that name?
A. It's something that I've been seeing for pretty much most of my life.
Q. Did you ever see --
A. Advertisements in magazines.
Q. At -- at Teen Challenge did you ever see a box that said BorgWarner on it?
A. I'm sure I did. But if I -- I can't recall specifically what the box looked like.
Q. And the box that you saw that had BorgWarner on it, do you know what was in the box?
A. Well, what I was looking for, generally, was a clutch plate, the friction part of it.
Q. Can you testify under oath that at the times that you or one of the young men in your program was taking a couple of seconds to sand a clutch plate, that your son Rick was around?
MR. KUNEN: Objection; form.
A. Would that -- would that be to recall a specific incident or just to say, well --
Q. (BY MS. COLE) Well, let's -- let's talk about a specific incident. Can you testify under oath that at



Teen Challenge that Rick was present in the vicinity of somebody sanding, for a few seconds, a clutch plate?
MR. KUNEN: Objection; form.
A. I don't think I can testify specifically that I can recall a specific time seeing that. But he was there a lot, and over a period of time we did do a lot of that, so there's --
Q. (BY MS. COLE) But without making an assumption, can you tell us -- and, if this is read to a jury, can you tell the jury -- for sure under oath, that Rick would have been around during the sanding for a couple of seconds of a clutch plate?
MR. KUNEN: Objection. Asked and answered. That's the exact same question.
THE WITNESS: Yeah.
Q. You can answer it again.
MR. KUNEN: It's the same. You want to just adopt your prior answer?
MS. COLE: Please let him answer the question unless you're instructing him --
MR. KUNEN: He already did.
MS. COLE: If you're instructing him --
MR. KUNEN: He already did.
MS. COLE: -- not to answer the question --
MR. KUNEN: You don't have to tell me how

to represent my client. He already answered it.
Q. (BY MS. COLE) I'm not understanding.
A. Well, I think --
MR. KUNEN: Hold on. Hold on. That's -- that's the question?
A. I think I'm not quite understanding too, so...
Q. (BY MS. COLE) Can you explain it to me, please?
MR. KUNEN: Explain what?
Q. (BY MS. COLE) Can you explain it to me, please?
MR. KUNEN: Explain what?
A. That -- that's what I'm wondering. I'm not sure exactly what you want me to explain, so...
Q. (BY MS. COLE) Okay. I'm trying to figure out --
A. Okay.
Q. -- because your -- your son's family brought this lawsuit. And they've named a number of parties to this lawsuit.
A. Okay.
Q. I'm trying to figure out if you can tell me with any certainty, under oath, that Rick was present in the vicinity of where this sanding of a clutch plate took place.



MR. KUNEN: Objection. I think the confusion is he's telling you he can't remember a specific date or time where that would have happened, but he knows that Rick was there a lot and a lot of work with BorgWarner clutches was being done. So I think you-all are kind of going over each other right now.
THE WITNESS: Talking past each other.
A. But I don't recall a specific incident, specific date that I could say, "Yeah, I remember seeing him right there when somebody was doing that," or "I remember him doing it himself." Because that's the kind of thing he would have done if he had been there. Somebody would say, "Hey, run the sandpaper over that." And he'd say sure. He was a -- he was a budding mechanic at a very young age.
Q. (BY MS. COLE) At what age -- strike that. We've covered -- we covered in the last deposition his coming in and out at a certain age more than when he was younger?
A. Uh-huh, yeah.
Q. At what age would he have actually participated in the hands-on work at Teen Challenge?
MR. KUNEN: Objection; form.
A. That, I couldn't say specifically.
Q. (BY MS. COLE) Were there any insurance



regulations that governed how old somebody had to be in order to do the mechanical work at Teen Challenge?
A. I don't recall any.
Q. Was there --
A. Nobody had discussed that with me that I can recall.
Q. Was there a rule about when you could allow little children into the shop for -- at Teen Challenge?
A. I don't believe there was because I think I was pretty much autonomous on that and I didn't ever rule against it. But I don't believe anybody else's kids came in there, you know, to any -- any -- the way my kids did. They kind of felt at home.
Q. During the period of 1973 to 1983, can you tell me what brands of automobiles clutches were done on?
A. Well, that would probably be just about any of them. But I would think probably mostly -- mostly Fords and Chevys and -- and some Dodges.
Q. Any foreign cars?
A. Possibly. I don't recall specifically any foreign cars, but I know some of the staff had some foreign cars.
Q. Can you tell me the clutch material, the pressure plate/clutch plate material that you were getting, did that also come from the NAPA store?



A. Yes.
Q. Everything came through NAPA?
A. Pretty much, yeah.
Q. And NAPA was the place that you sent the cores to -- to have the pressure materials put on?
A. Yes, uh-huh.
Q. When the clutch materials were taken out of a car in order to have it replaced, how was that done?
MR. KUNEN: Objection; form.
Q. (BY MS. COLE) Can you explain to me the process?
A. Well, if you're going to -- first thing you got to do is disconnect the linkage from the transmission and remove the driveshaft and unbolt the rear crossmember. And you've got -- got to have something to hold the engine up because the crossmember usually supports the engine -- put a block and a jack under the engine pan.
And then you remove the bell housing. Well, you remove the transmission, then you remove the bell housing. And then you take all of the bolts out of the pressure plate and then it just comes off then. You've got to hold onto it when you're taking that last bolt out or you'll get it in your face. And --
Q. And that's heavy.

A. I've never done that, but I've thought about it and feared it, so it never happened.
Q. Once it was taken off -- the bell housing was taken off and the plate was taken off, what happened next?
A. Well, you take an air hose and you blow all the dust out of it. And then you wipe it out and maybe -- maybe wash it down a little bit with some solvent or something to get it all -- all cleaned out and clean the flywheel off so that it's nice and clean.
And then you take the parts that you don't need anymore and send them out. And you look the pressure plate over, make sure it's usable. And if it's usable, you put it back. And if it doesn't look like it's usable, then you send that out and get that replaced too.
Q. And is the sending out --
MR. KUNEN: Hold on.
A. And the throw-out bearing usually at the same time.
Q. (BY MS. COLE) The sending out was all to A&G?
A. Yes, uh-huh.
Q. And the air hose that this used to blow out the dust, how long did that take?
A. Oh, that doesn't take long.



Q. Couple of seconds?
A. Yeah. Maybe a little more than that because you've got to get up in nooks and crannies.
Q. Maybe 10 or 15 seconds?
A. Excuse me?
Q. Maybe 10 or 15 seconds?
A. Yeah probably that, uh-huh.
Q. Can you tell me if that is something that you have a specific recollection of Rick doing when he was coming by the shop to hang out?
A. No. I don't have a specific recollection of it.
Q. Do you have a recollection, specifically, of him being around close by when somebody else was doing it?
A. Yes.
Q. Tell me about that. When was that?
A. Well, I don't have -- you mean, like a specific date? Or do I -- do I know that that happened?
Q. Tell me if you have -- first of all, do you have a specific recollection of --
A. I don't have a specific recollection. I have a specific recollection of him being there a lot when these things were going on. But as far as remembering a particular date, I don't recall one of those.



Q. Are you making an assumption that because he was around as much as he was and work was -- all kinds of work was being done, that he was around when blowing out of the bell housing was being done?
MR. KUNEN: Objection.
A. Yes.
THE WITNESS: I shouldn't have answered that.
MR. KUNEN: Well, I think you've answered it pretty clearly.
THE WITNESS: Okay.
MR. KUNEN: You don't remember a specific date, but you remember him generally being there when this work was being done.
Q. (BY MS. COLE) Can you tell me, sir, what the box of BorgWarner clutch material looked like?
A. No, not specifically.
Q. Can you tell me any colors that were on the box?
A. No.
Q. Can you tell me what the box said?
A. Other than the name?
Q. Other than the name.
A. No.
Q. Can you tell me if there was any other writing on the box other than the name?



A. I'm sure there was.
Q. Did you ever read the other writing that was on the box?
A. Possibly. I couldn't swear to that, but...
Q. Were there inserts or papers that came in these boxes?
A. Might have been. I don't recall any in particular.
Q. Did you ever read those papers?
A. I possibly did.
Q. Do you remember what they said?
A. No, I don't.
Q. Were there instructions on how to do a clutch job on the paperwork that came in the boxes?
A. There may have been.
Q. Do you recall reading them?
A. No, I don't.
Q. Do you recall pointing them out to the young men at Teen Challenge that you were instructing?
MR. KUNEN: Objection; form.
A. I don't recall pointing out instructions that came in the box. I recall giving them instructions.
Q. (BY MS. COLE) Giving them instructions, written instructions?

about Texas.
A. Yeah.
Q. Going back to the conversation that we had about BorgWarner.
A. Uh-huh.
Q. When you got -- when the shop sent the core back to the NAPA store and the friction material was applied at the NAPA store, was it bonded or was it riveted?
MR. KUNEN: Objection; form.
A. As I recall, clutches were all riveted.
Q. (BY MS. COLE) Was there anything written on the clutch itself -- the clutch plate itself?
A. I can't recall specifically.
Q. Were there any brand names or manufacturer names written any place on the material itself?
A. I don't remember that there was.
Q. When you got it back from the NAPA store, did it come in a box or did it just come in a bag?
A. Came in a box.
Q. Did the box have the NAPA logo on the box?
A. I can definitely say I saw a lot of NAPA logos on boxes.
Q. Okay.
A. I don't recall that I saw a NAPA logo on the --



on the clutch material.
Q. Do you recall anything that was written on the box of clutch material?
MR. KUNEN: Other than BorgWarner?
Q. (BY MS. COLE) Anything at all.
A. Other than BorgWarner, I don't recall. I know they -- boxes always have a lot of things written on them.
Q. Did the boxes always say BorgWarner on it when it came back as a refinished clutch from the NAPA store?
A. I believe so.
MR. KUNEN: Objection; form.
Q. (BY MS. COLE) I'm sorry?
A. Yes, I think so.
Q. Were there any type of clutch materials other than BorgWarner that came from this NAPA store?
A. I don't recall any.
Q. Are you certain that it came from the NAPA store?
A. Oh, yes.
Q. Are you certain that it said BorgWarner on the boxes of refinished clutch material?
MR. KUNEN: Objection; form. Misstates testimony.
A. Yes.



Q. (BY MS. COLE) What did you do with the boxes?
A. Threw them away in the garbage.
Q. Was there anything on these boxes to indicate that it was refinished and not new clutch plate material?
MR. KUNEN: Objection; form.
A. I don't recall that.
Q. (BY MS. COLE) Do you know if what you got back was refurbished or new?
A. I don't know that.
Q. Do you know the source of the friction material that was in the box?
A. No, I don't.
Q. Do you know if the friction material contained asbestos?
A. I do not know that.
Q. You said you used a solvent to clean out the bell housing and surrounding equipment. What was the solvent?
A. Varsol.
Q. Varsol?
A. Uh-huh.
Q. Can you spell that for me, please?
A. I -- not positively, but I think it's V-A-R-S-A-L [sic].



Q. What kind of material is that?
A. To my understanding, it is a mineral spirits with a chemical in it that retards fire so that it's not so likely to catch on fire.
Q. Was that something that was wiped on with a cloth?
A. Yes.
Q. Was it something that was sprayed on with a spritzer?
A. No.
Q. What sort of dust accumulates in the innards of a car --
MR. KUNEN: Objection --
Q. (BY MS. COLE) -- that's been running?
MR. KUNEN: Objection; form.
A. I'm not sure what you're asking.
Q. Well, is there road dust?
MR. KUNEN: Objection; form.
A. Sure.
Q. (BY MS. COLE) Is there dust from the tires?
MR. KUNEN: Objection; form.
Q. (BY MS. COLE) That gets caught up in the tires and gets put into the insides of the car?
A. That sounds logical, yeah.
Q. Do you know what was in the dust that was being

answered.
Q. (BY MS. COLE) Or was that later?
MR. KUNEN: Same objection. Asked and answered.
A. Or was that later?
Q. (BY MS. COLE) Let me -- let me rephrase the question.
A. All right.
MR. KUNEN: It was already asked.
Q. (BY MS. COLE) Was Rick --
MR. KUNEN: You said "I don't remember."
Q. (BY MS. COLE) Was Rick allowed to do hands-on work on the cars at Teen Challenge when he was 12?
A. Yes.
Q. What kinds of work was he doing at age 12?
A. Probably, not much.
Q. By "not much" you mean he was doing what?
MR. KUNEN: Objection; form.
A. I would think probably like washing cars, we did that sometimes. I can't tell you exactly what age he learned to change tires on a tire changer, but he was pretty young when he learned that. And he got really good at it.
Q. (BY MS. COLE) When he was 13 what kind of work was he allowed to do?



MR. KUNEN: Objection; form.
A. By the time he was 13, he was pretty capable of doing a good bit of automotive work.
Q. (BY MS. COLE) So the time that -- between 12 and 13 is when he learned a lot of the automotive work?
MR. KUNEN: Objection. Misstates testimony.
A. That -- that sounds like a good estimate.
Q. (BY MS. COLE) And when he was 13, that would have been the time that he would have been around the changing of clutches?
A. Yes.
MR. KUNEN: Objection.
Q. (BY MS. COLE) Was there something that -- that happened that caused you to leave Teen Challenge?
A. It was a fairly stressful job. All of the guys had problems. And so, for ten years of listening to guys problems, I felt like I needed something a little different. And I got tired of that climate up there, the cold weather.
Q. It does get cold.
A. I went from there to Louisiana, so...
Q. What month of 1983 did you quit and leave Teen Challenge?
A. I do not know.



Q. Wintertime or summertime?
A. I would say it probably was summertime. Probably when the kids were out of school because we didn't want to take them out of school, so...
Q. Sure. So Rick worked at Teen Challenge until he was about 13 and a half?
MR. KUNEN: Objection; form.
Q. (BY MS. COLE) Is that right?
A. Your math is probably better than mine. I'd have to think about it for a while to come up with it.
Q. He was born in what month?
A. When was he born?
Q. What month.
A. September.
Q. So if you left in June, in the summertime, then he was not yet 14 or not yet 13? He was born in 1970, so --
MR. KUNEN: If you know. You don't have to do the math.
Q. (BY MS. COLE) So he'd be not yet 15; is that right?
MR. KUNEN: If you know.
A. Close enough. I think you probably already did the math on it, so...
Q. (BY MS. COLE) Go through this lickety-split



and I will be done.
Did the young men who were at Teen Challenge do their own laundry?
A. I don't really know. I -- I don't know.
MS. COLE: I think those are all the questions I have for you. Thanks.
THE WITNESS: Okay. Thank you.
EXAMINATION
BY MR. PARKS:
Q. Hi, Mr. Doolin. My name is Kevin Parks.
A. Okay.
Q. I'm going to skip around a little bit so -- and I'll try to make it clear what time period and location I'm talking about.
A. Okay.
Q. But if that's not clear to you, let me know and I'll restate the question.
A. All right. Okay.
Q. You mentioned recalling Rick doing brake work on a '64 Chevy?
A. Yes.
Q. Do you recall that?
Where did he do that brake work?
A. Probably in the shop.
Q. Which shop?

Q. Well, you said you believed you may have worked around it.

MR. KUNEN: We know what he said. We know what he said. He literally just said it 30 seconds ago.

MR. PARKS: And I'm trying to find out some basis for what he has already testified to. And I don't --

A. Well, mostly -- mostly just from what I have read since then, you know, that says that a lot of stuff had asbestos in it then. But at that time, I didn't -- I had no -- I had no inclination. You know, I mean, I was aware that asbestos existed, but nobody thought it was bad. So I really knew very -- so very little about it that I never gave it a thought then.

Q. (BY MR. PARKS) Right. And based on what you've read or what you've learned since then, what materials or products do you believe may have contained asbestos?

MR. KUNEN: He's going to be guessing. Why do you want him to try to guess about something? It's pure speculative.

MR. PARKS: I'm asking for the basis for the testimony that he has given.

MR. KUNEN: Don't guess. So unless -- unless you know or have personal knowledge as to what



contains asbestos at that place, no one wants you speculating or guessing about it.

Q. (BY MR. PARKS) And that's not what I'm asking you. I'm asking you: Based on what you have read or learned since then, what has led you to believe you may have worked around asbestos?

MR. KUNEN: If you can answer that without guessing, for go it, but...

A. I can't really answer it without guessing. I'd be -- I'd just be looking back and saying: Okay, I think maybe this had it; maybe this had it. It would all be maybes.

Q. (BY MR. PARKS) Where did you read about things that contained asbestos?

A. Oh, Reader's Digest mostly, but probably some other places.

Q. Did those reading materials reference any specific materials or products?

MR. KUNEN: Objection; form.

A. I don't recall if they did.

Q. (BY MR. PARKS) The house that you built at Teen Challenge, was there any drywall in that house?

MR. KUNEN: Asked and answered.

A. Yes.

Q. (BY MR. PARKS) Did you do any of that drywall



work?

A. No.

MR. KUNEN: Asked and answered.

Q. (BY MR. PARKS) Were you around while any of that drywall work was done?

A. Yes.

Q. Was Rick around when --

A. If by that do you mean, did I walk through while I was doing something else?

Q. Yes.

A. Yeah.

Q. Was Rick around when any of that --

A. I don't recall -- I don't recall any specific incidences.

Q. Do you recall what type of shingles -- well, what type of roof did that house have?

A. It had shingles.

Q. Do you recall what type of shingles it had?

A. No, I don't.

Q. Did you install them?

A. I don't specifically recall installing shingles.

Q. Did that house have siding?

A. No.

Q. When you were working as a carpenter in



Illinois, what -- well, were you ever working on jobsites while other trades were doing their work?

A. You mean like plumbers and -- yes.

Q. What other type of workers were you around?

A. Plumbers, electricians.

Q. Would that be typical on your work day to be working around other -- other workers?

A. Yes.

Q. Did you ever work around anyone doing drywall or Sheetrock work?

A. Yes.

Q. Would that be typical in your work day?

MR. KUNEN: Objection; form.

A. I wouldn't say typical, but it happened from time to time.

Q. (BY MR. PARKS) Were you ever working around insulators?

A. Yes.

Q. Would the drywall and insulation work create dust?

MR. KUNEN: Objection; form.

A. Pretty much always does, yeah, drywall especially. Insulation was mostly fiberglass insulation, no dust there.

Q. (BY MR. PARKS) And would you be working close

Q. Okay. Like work -- work clothes, like overalls or --

A. Yeah, T-shirt and blue jeans usually. Coat in the winter, it got cold up there.

Q. And you have no specific recollection of your son working with a Rayloc brake, correct?

MR. KUNEN: Objection; form.

Q. (BY MR. SALAS) Like on a specific day or specific time?

A. No.

Q. And the same thing with NAPA, correct?

A. No.

Q. Correct?

A. Not specific, right.

Q. Were there any masks available at Teen Challenge? Like, breathing masks?

A. I don't recall.

Q. While you worked at Teen Challenge, did you ever read about the benefits or any -- anything about masks?

A. I don't recall reading anything about it. I know the paint shop, they always used the masks.

MR. SALAS: That's all I have, sir. Thank you for your time.

MR. KUNEN: All right. Deposition is



concluded and he'll read the deposition transcript, please. Off the record.

(Deposition concluded at 2:16 p.m.)



WITNESS CORRECTIONS AND SIGNATURE

Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change. Please sign each page of changes.

PAGE/LINE CORRECTION REASON FOR CHANGE

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

____________________________

EDWARD DOOLIN



SIGNATURE OF WITNESS

I, EDWARD DOOLIN, solemnly swear or affirm under the pains and penalties of perjury that the foregoing pages contain a true and correct transcript of the testimony given by me at the time and place stated, with the corrections, if any, and the reasons therefor noted on the foregoing correction page(s).

____________________________

EDWARD DOOLIN

STATE OF __________ *

COUNTY OF _________ *

Before me, ______________________________, on this day personally appeared EDWARD DOOLIN, known to me, or proved to me under oath, to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _______ day of ____________, 20___.

____________________________

NOTARY PUBLIC IN AND FOR THE STATE OF ____________

My Commission Expires: ____________

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STACEY DOOLIN, as )
Personal Representative )
of the Estate of RICHARD )
E. DOOLIN )
)
Plaintiff, )
)
v. ) CASE NO:
) 3:16-CV 00778 MMH-PDB
PNEUMO ABEX LLC, et al, )
)
Defendants. )

****************************************************

REPORTER'S CERTIFICATION

THE STATE OF TEXAS:
COUNTY OF HARRIS:

I, Morgan Veletzuy, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, EDWARD DOOLIN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on March 21st, 2016,to the witness, or to the attorney for the witness, for examination, signature, and return to Veritext Legal Solutions, by ___________, 20____;



That the amount of time used by each party at the deposition is as follows:

HENRY SALAS - 00:33
SUSAN COLE - 00:42
KEVIN PARKS - 00:32
MARC KUNEN - NONE

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the 21st day of March, 2017.

Morgan Veletzuy
_______________________________
MORGAN VELETZUY, CSR No. 9271.
Expiration Date: 12-31-17
Veritext Legal Solutions
Firm Registration No. 571
300 Throckmorton Suite 1600
Fort Worth, Texas 76102
800-336-4000